UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| HOLLIE MALPHRUS, | ) | Civil Action No.: 4:19-cv-02439-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **ORDER** |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits (DIB) and supplemental security income (SSI). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This action is proceeding before the undersigned by voluntary consent pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

## I. RELEVANT BACKGROUND

### A.    Procedural History

Plaintiff filed an application for DIB and SSI on October 20, 2015, alleging inability to work since September 30, 2015. (Tr. 15). Her claims were denied initially and upon reconsideration. Thereafter, Plaintiff filed a request for a hearing. A hearing was held on May 1, 2018, at which time Plaintiff and a VE testified. (Tr. 15). The Administrative Law Judge (ALJ) issued an unfavorable decision on September 6, 2018, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 15-24). Plaintiff submitted additional evidence after the hearing and after the ALJ's decision.

Plaintiff filed a request for review of the ALJ's decision, which the Appeals Council denied on June 26, 2019, making the ALJ's decision the Commissioner's final decision. (Tr. 1-3). Plaintiff filed this action on August 28, 2019. (ECF No. 1).

**B.    Plaintiff's Background and Medical History**

Plaintiff was born on March 28, 1967, and was forty-eight years old at the time of the alleged onset. (Tr. 57). Plaintiff alleges disability initially due to chronic heart disease, coronary artery disease, weakness, shortness of breath, weight loss, and unstable angina. (Tr. 57). Plaintiff had past relevant work experience as outside merchandise delivery and as a secretary. (Tr. 23).

**2015**

In February 2015, Plaintiff had been off of anticoagulation medication Lovenox due to problems with paperwork. Imaging showed acute deep vein thrombosis in the left common femoral vein. Hematology did not recommend any other further workup or therapy. Plaintiff was to continue Lovenox. (Tr. 416). Plaintiff complained of one-sided headaches. (Tr. 416). Plaintiff had factor V Leiden deficiency with an IVC filter already in place. (Tr. 417). Plaintiff had been without insurance for two to three years, had received Lovenox for free through the company, and had current difficulties supplying them with her tax information. Plaintiff was resistant to try Coumadin again or Xarelto. (Tr. 420).

Plaintiff reported changes since July 2015 to SSA with worsening nerve issues and pain that lasts up to six hours at a time. Sometimes, her symptoms mimic a heart attack, which triggers panic, anxiety, and depression. (Tr. 248). Plaintiff needs help shopping because the cart gets too heavy to push. Fitted clothes cause discomfort. (Tr. 253).

On July 28, 2015, imaging showed EF of 50-55%. (Tr. 396). Plaintiff was admitted to the

2

hospital for four days in July for a cardiac cath. (Tr. 586). A stent was placed due to 90% occlusion LAD. (Tr. 602). Plaintiff was seen in the emergency room for chest pain in August. (Tr. 544).

On September 23 through 26, 2015, Plaintiff was seen in the emergency room for chest pain. July's prior stent was noted. (Tr. 512).

On September 30, 2015, Plaintiff was admitted for cardiothoracic surgery and was discharged on October 6. (Tr. 322). On September 25, as history, Plaintiff underwent a "LHC" and developed coronary spasms during the procedure. Plaintiff went into "VT/VF" and was shocked. Plaintiff's left main had pressure dampening and no good efflux. (Tr. 322). On September 30, Plaintiff presented again with chest pain. Cardiac cath revealed significant left main disease. (Tr. 322). On September 30, EF was 70%. (Tr. 365). Plaintiff was attempted to be transferred from one hospital to another, but no beds were available. (Tr. 483, 486). On October 1, Plaintiff had a coronary artery bypass grafting with two vessels. (Tr. 329). On October 4, chest imaging showed low lung volumes with patchy left basilar atelectasis with no evidence of pleural effusions or pneumothoraces. (Tr. 342). On October 6, Plaintiff was deemed stable for discharge. (Tr. 323). Instructions at discharge were walk as tolerated and no driving/lifting more than 10 pounds for eight weeks. (Tr. 325).

On October 14, 2015, Plaintiff was seen by Dr. Katz of MUSC. Plaintiff was doing well without complaint after coronary bypass. Plaintiff was on appropriate medications. (Tr. 321, 687).

On October 21, 2015, Plaintiff presented to Beaufort Memorial and was seen by Dr. Zeccola. Impression was shortness of breath after bypass graft three weeks earlier and chronic anti-coagulation. Lovenox was increased; tests were ordered. (Tr. 451). Plaintiff had no chest pain but felt weak and dizzy that day. Imaging showed no embolism. (Tr. 452). Exam was normal with no edema. (Tr. 452). On October 22, Plaintiff denied chest pain, shortness of breath, syncope, or heart

3

failure symptoms. Exam was normal. Assessment was atypical chest pain. EKG and cardiac biomarkers ruled out other diagnosis. "She has nonspecific ST-T wave changes that are noted chronically." (Tr. 454). Plaintiff was stable but was admitted for one day given her recent events. (Tr. 457-458). EF was 50-55%. (Tr. 472, 856). On October 21, imaging showed chronic nonocclusive DVT within the left leg extending from the proximal superficial femoral vein down into the calf. (Tr. 476). There was no evidence of pulmonary embolism or acute intra thoracic process. (Tr. 477). There was no sign of acute cardiopulmonary disease. (Tr. 478, 631). Plaintiff was discharged on October 22, but returned with a similar episode on the way home from the hospital. (Tr. 808). Exam was normal. (Tr. 809). Plaintiff seemed anxious, but Plaintiff stated she was not anxious. (Tr. 810). All labs, EKG, and CT were normal. (Tr. 810, 814).

On November 4, 2015, Plaintiff was seen by Dr. Etheridge. (Tr. 652, 931). Most of the notes are illegible. Depression/anxiety was doing well on medication "despite [three illegible words]." (Tr. 652).

On November 5, 2015, Plaintiff presented to MUSC with complaints of pounding heart and chest pain shooting down her back, left arm, and jaw. (Tr. 672). Exam was normal. (Tr. 673). EKG showed no evidence of acute ischemia. (Tr. 675). Diagnosis was acute chest pain. But, given her recent history, Plaintiff was admitted to cardiology. (Tr. 675). EF was 78%. (Tr. 682). Impression of some testing was SVG graft to the OM is diffusely dilated with evidence of filling defect along its anterior aspect, which is likely slow flow and makes it prone to clot formation. Small amount of clot cannot be excluded. There was moderate stenoses proximal to the stent. (Tr. 682). Plaintiff was discharged on November 7. "She has not been taking her BB. She has otherwise been compliant with ASA and Atorva." (Tr. 684).

On November 16, 2015, Plaintiff presented to Beaufort Memorial with chest pain. (Tr. 772). Cardiac enzymes were positive. (Tr. 773). Exam was normal. (Tr. 776, 778). Imaging showed stable chest. (Tr. 795). On November 17, 2015, Plaintiff presented to MUSC. Plaintiff complained of chest pain and palpitations. (Tr. 660). Plaintiff had been transferred from Beaufort after two episodes the prior day. Pain radiated into her chest, abdomen, and teeth and down her left arm. Exam was normal. (Tr. 662). EKG was grossly unchanged. "Given recurrent pain and positive biomarkers, she is likely best served with repeat catherization." (Tr. 663). Results were moderate LAD stenosis, severe first OM stenosis at the anastomosis site, mild RCA stenosis, patent LIMA to LAD, and occluded SCG to OMI. IVUS of the OMI showed severe fibrocalcific disease. (Tr. 665). Recommendation was aspirin indefinitely and ticagrelor for 12 months. (Tr. 665). On November 19, Plaintiff felt well with no complaints. (Tr. 666).

On November 24, 2015, Plaintiff was seen by Dr. Taylor. (Tr. 1056). History was Plaintiff clotted off of one of her leg grafts after her bypass surgery. It was reasonable to increase Lovenox dosing. Plaintiff's status was fully active and able to carry on activities without restriction. (Tr. 1056). Upon exam, every category was normal with no edema. (Tr. 1057). Dosing was changed due to cardiac events. (Tr. 1057).

On December 16, 2015, Plaintiff presented to the emergency room via ambulance with chest pain complaints. (Tr. 750). Episodes lasted 2-3 minutes and two episodes occurred the prior night then resolved. Pain radiates to her left arm, shoulder, neck, and back. (Tr. 750). Chest pain was described as pressure/numbness. Exam was normal in all categories. (Tr. 751). Labs were normal. (Tr. 752). Plaintiff was transferred to MUSC. (Tr. 753, 870). Behavior was anxious. (Tr. 755). Imaging showed no acute abnormality and no pulmonary embolus. (Tr. 758). Imaging showed mild

cardiomegaly and no sign of acute pulmonary disease. (Tr. 759). Plaintiff's husband reported her extremities are warm on one side and cold on the other frequently at night. (Tr. 871). Exam was normal. (Tr. 872-873). EF was 70%. (Tr. 873). Plaintiff presented with tingling/numbness in her chest with radiation to her back, arm, and jaw. (Tr. 873). ECG was without change from prior ECG. (Tr. 874). Exam on December 18 was normal. (Tr. 875). A heart CT on December 17 showed no "PE and occluded graft." Prior imaging shows occlusion likely present in November. (Tr. 877). No new disease was found and treadmill stress test was ordered. (Tr. 878). On December 19, it is noted the prior day that Plaintiff underwent exercise stress test with good result, reaching 10.7 mets without anginal symptoms. (Tr. 879, 881). While the exercise stress test was not fully interpretable by the examiner, Plaintiff was able to exercise for 12-15 minutes while producing 10 METS without incidence of chest pain or arm pain. (Tr. 884). Exam was normal. (Tr. 879). Plaintiff was discharged on December 19. Chest pain was felt to be due to some component of vasospasm. (Tr. 884).

On December 29, 2015, Plaintiff was seen by Dr. Todoran of MUSC, (Tr. 869). At the December 16 admission, Plaintiff was started on amlodipine for coronary artery vasospasm. Plaintiff had been participating in cardiac rehab without any further chest pain. (Tr. 869). Plaintiff denied any symptoms of exertional dyspnea, lower extremity edema, or palpitations. Upon exam, every category was normal. (Tr. 869-870). "She is stable from a cardiovascular standpoint and not experiencing symptoms of angina. She is taking lovenox so I am discontinuing her aspirin after 3 months and she will continue the clopidogrel for 1 year." (Tr. 870).

**2016**

On February 9, 2016, state agency non-examining consultant, Dr. Wilson, M.D. reviewed Plaintiff's records and opined an RFC of light, occasionally climb ramps/stairs, never climb

ladders/ropes/scaffolds, and frequently balance/stoop/kneel/crouch/crawl. Plaintiff had several hospital admissions for complicated symptoms and EF had not been severely compromised. Plaintiff was able to do the RFC by one year from onset date. (Tr. 66). On September 9, 2016, Dr. Bittinger affirmed this assessment. (Tr. 93-97).

On February 10, 2016, Plaintiff completed a function report. (Tr. 229). Plaintiff reported she cannot lift and hold her arms up to cut hair all day like she did before. She did not have the energy to stand all day. She has Factor V and since surgery when she stands or walks too long, her left calf and ankle swells. The same occurs when she sits too long. Plaintiff hurts and has a lot of tingling and numbness in her left shoulder running down her back and left leg. (Tr. 229). Plaintiff has been very depressed and crying a lot. (Tr. 229). Plaintiff cleans then rests. Plaintiff sometimes takes a nap. (Tr. 230). Plaintiff walks three times a week. (Tr. 230). Plaintiff has no problems with personal care. (Tr. 230). Plaintiff prepares her own lunch and breakfast and it takes 15-30 minutes. (Tr. 231). Plaintiff can do her own laundry, clean her bathroom and bedroom, twice a week, but must rest. (Tr. 231). Plaintiff can drive. Plaintiff can shop every two weeks. (Tr. 232). Plaintiff reads every day without problem. Plaintiff talks with others at least every other day. (Tr. 233). Plaintiff is always in pain and does not feel well. She tires easily. (Tr. 234). It hurts to lift her arms to reach, especially on the left side. Plaintiff can walk 15-20 minutes, then she is out of breath. (Tr. 234). Plaintiff can pay attention for an hour. Plaintiff does not handle stress well and has anxiety, panic attacks, and chest pains. (Tr. 235).

On February 17, 2016, Plaintiff was seen by Dr. Etheridge for an exam for disability. (Tr. 930). Writing is mostly illegible. It is noted Plaintiff needed a form completed for her mental condition. Plaintiff was on Zoloft for depression/anxiety. Plaintiff was followed by a cardiologist.

7

Plaintiff reported daily neck and shoulder pain. Plaintiff examined as mildly anxious. Plaintiff had increasing social stressors and symptoms, but medications helped. (Tr. 930). Dr. Etheridge opined on a separate form that Plaintiff had good ability to complete complex tasks, had good attention/concentration, and had worried/anxious mood/affect. Medication helped Plaintiff's depression/anxiety; psychiatric care had not been recommended. (Tr. 935).

On February 28, 2016, Plaintiff presented to Beaufort Memorial. (Tr. 1100). Plaintiff reported chest pain that did not radiate. Upon exam, Plaintiff had no back tenderness and had full range of motion. Plaintiff had normal gait and 5/5 strength. Plaintiff had normal cardiovascular exam with no edema and no respiratory distress. (Tr. 1101). EKG was normal. (Tr. 1102). Plaintiff received aspirin and symptoms markedly improved. (Tr. 1102). Discharge disposition was atypical chest pain. (Tr. 1107). Labs later showed nitrite positive and urinary tract infection. (Tr. 1111). Plaintiff was negative for pulmonary emboli. (Tr. 1118).

On March 1, 2016, state agency non-examining consultant, Dr. Neboschick, Ph.D, reviewed Plaintiff's records and opined anxiety and affective disorders were non-severe. (Tr. 62-63). On June 29, 2016, Dr. Telford-Tyler, Ph.D. affirmed this assessment. (Tr. 94-95).

On March 17, 2016, Plaintiff presented to the emergency room at MUSC. (Tr. 944). Plaintiff complained of left-sided, intermittent chest pain with tingling across upper abdomen and pain radiating to her jaw/face, back, and arm. (Tr. 944). Exam was normal. (Tr. 946). Plaintiff completed a treadmill exercise stress test for ten minutes and developed symptoms of fatigue and dyspnea but not chest pain. (Tr. 949). EKG during exercise showed sinus tachycardia with isolated PVCs. (Tr. 949). EF was 80%. (Tr. 949). Impression was normal myocardial perfusion and no evidence of ischemic ST-T wave abnormalities. (Tr. 949). Other imaging showed no evidence of acute

cardiopulmonary disease. (Tr. 950). Upon a different exam, 2/6 systolic murmur was heard at RUSB and Plaintiff had mild tenderness to palpation of lower upper quadrant of abdomen. Plaintiff had no musculoskeletal tenderness, had normal range of motion, and no edema. (Tr. 961). On March 19, it is noted Plaintiff was recently discharged on March 18. (Tr. 964). Plaintiff was concerned her negative stress test did not definitely rule out a cardiac etiology of her pain. (Tr. 964). Upon exam, Plaintiff had tenderness to palpation of sternum and slight tenderness to palpation of abdomen at the location of a prior drain. (Tr. 967). Plaintiff was told the recent stress test was reassuring and other etiologies of chest pain, like costochondritis, scar tissue, neuropathic pain, and other musculoskeletal pains, were possible. (Tr. 967). There was no indication for further cardiac testing. (Tr. 968). Discharge date was March 23. (Tr. 975). Plaintiff was monitored on telemetry without incident with negative troponins and unchanged EKGs. Because of concern that it was neuropathic pain, imaging of spine was ordered and was notable for degenerative changes at C4-6, "which may explain her symptoms." Plaintiff was prescribed gabapentin and referred to neurology. (Tr. 977). Plaintiff was concerned that tingling was a side effect of amlodipine, so it was ceased. (Tr. 977).

On March 19, 2016, Plaintiff presented via ambulance to the emergency room at Beaufort Memorial. (Tr. 1007). EMS reported the monitor showed sinus rhythm. On the hospital's monitor, Plaintiff was showing sinus rhythm with an occasional PVC. Plaintiff stated she would only go to Beaufort to be transferred to MUSC. (Tr. 1013). Upon exam, Plaintiff appeared anxious and in obvious, moderate distress. (Tr. 1018). Plaintiff did not have respiratory distress. Plaintiff received chewable aspirin and nitro-bid ointment on chest. (Tr. 1019). Symptoms markedly improved in the emergency room after treatment. (Tr. 1018). Later, Plaintiff had normal sinus rhythm. (Tr. 1025). Later, Plaintiff was in no distress. (Tr. 1035). Plaintiff reported pain in left upper chest radiating to

left shoulder. (Tr. 1035). Pain was 5/10. (Tr. 1035). Imaging showed no acute disease. (Tr. 1043).

On March 31, 2016, Plaintiff was seen by Dr. Todoran. (Tr. 980, 1134). Plaintiff's stress test was negative for ischemia, and at Beaufort, Plaintiff had SVT. Exam was normal in all categories with no edema. (Tr. 980-981). "She is stable from a cardiovascular standpoint and not experiencing symptoms of angina." (Tr. 981). "She has an exercise tolerance with normal perfusion. Her symptoms of arm numbness seem to be neurological." (Tr. 981).

On May 2, 2016, Plaintiff presented to the emergency room at Beaufort Memorial. (Tr. 992). Plaintiff dropped a cup on her ankle the week prior and noticed increased swelling and pain. (Tr. 993). Plaintiff presented with decreased range of motion. (Tr. 995). Plaintiff was able to ambulate with mild difficulty. There was a chronic clot noted of the left femoral vein with no DVT. Plaintiff was to continue Lovenox, rest, elevation, and compression and follow up with her hematologist. (Tr. 996). Impression was peripheral edema, chronic DVT, and history of Factor V deficiency. Condition was stable. (Tr. 997). Imaging showed chronic left superficial venous thrombosis and no acute deep venous thrombosis. (Tr. 1002).

On May 24, 2016, Plaintiff was seen by Dr. Taylor of Summit Cancer Care. (Tr. 1053). Plaintiff was managed for her hypercoagulable state. Plaintiff reported a significant increase in swelling of her left leg over the last few weeks. Plaintiff reported she went to the hospital and imaging showed no clot. "Clearly, this leg is significantly larger than what I remember her leg looking like." Plaintiff had more imaging, which showed a chronic clot but no acute thrombosis. Plaintiff did not need to change medications but needed to be more vigilant with compression garments. Status was fully active, able to carry on all activities without restrictions. (Tr. 1053). Upon exam, Plaintiff had left lower extremity edema. Plaintiff had normal gait and musculoskeletal. (Tr.

1054). Plaintiff was to continue with Lovenox injections for Factor 5 leiden heterozygous with recurrent "PE." (Tr. 1055). Imaging showed no evidence of deep vein thrombosis in either lower extremity; there was nonocclusive chronic appearing deep vein thrombosis left superficial femoral vein and chronic appearing occlusive thrombus left anterior tibial vein. (Tr. 1058, 1098).

On May 30, 2016, Plaintiff presented to St. Joseph's in Georgia. (Tr. 1069). Plaintiff's discharge diagnosis included chest pain, unstable angina, and left shoulder/neck pain. (Tr. 1069). Imaging of chest and shoulder were negative. Spine imaging showed mild diffuse spondylosis or facet arthropathy and mild spondylolisthesis throughout the upper cervical spine. EF was 55-60% with mildly thickened mitral valve. (Tr. 1069). Plaintiff reported left chest pain with shortness of breath and diaphoresis lasting a few minutes, spontaneously resolving, and of a burning nature, radiating to her shoulder and back. EKG showed no ischemic changes. Plaintiff was recommended for diagnostic coronary artery catheterization and for further workup of neck and shoulder pain with MRI if symptoms persisted. (Tr. 1070). "There does not appear to be a cardiac etiology." (Tr. 1070). Plaintiff reported a history of fibromyalgia. Upon exam, Plaintiff had left lower extremity edema and was anxious. (Tr. 1073). "Her EKG does have some mild nonspecific changes, which have resolved." (Tr. 1075).

On June 17, 2016, Plaintiff completed a function report. (Tr. 259). Plaintiff reported similar symptoms as before. (Tr. 259). Plaintiff cannot drive more than two hours at a time as she hurts in her neck and back. (Tr. 262). Plaintiff can walk half a mile. (Tr. 264). Plaintiff can pay attention for 30 minutes. (Tr. 264). Plaintiff's mother made similar reports in June 2016. (Tr. 268). Depending on how Plaintiff feels, she will help clean. (Tr. 269). Plaintiff does light cleaning once or twice a week. (Tr. 270). Plaintiff walks around the yard daily with her mother. Plaintiff goes shopping twice

11

a month for one hour with her mother. (Tr. 271). Plaintiff has chest pains when she gets upset. (Tr. 274).

On August 29, 2016, Plaintiff was seen by Dr. Smith. (Tr. 1129). Plaintiff complained of a neck and back pain level of 9-10 that wraps around and down her arm. Plaintiff reported she was told she may have fibromyalgia. (Tr. 1129). Plaintiff reported in the past Gabapentin had helped a little but she could not function while taking it. Tramadol helped. (Tr. 1129). Upon exam, it was normal with no particular tenderness noted. (Tr. 1129-1130). Tramadol was prescribed. (Tr. 1130). MRI was ordered.

On September 26, 2016, Plaintiff was seen by Dr. Smith. (Tr. 1126). Plaintiff reported a pain level of 5. Plaintiff had neck and arm pain, but she was more concerned about chest pain and related the pain to a long tube that hurt bad after surgery when it was pulled out. (Tr. 1126). Assessment was nothing on her neck per MRI and chest pain of unknown etiology, "probably a nerve irritation." (Tr. 1126). MRI showed moderate left C4-6 foraminal stenosis secondary to diffuse annular bulging and left foraminal disc protrusion with no exiting nerve root impingement. Disc protrusion did contact with left C6 exiting nerve root. (Tr. 1128).

On October 24, 2016, Plaintiff was seen by Dr. Smith of Volunteers in Medicine. (Tr. 1122). Plaintiff reported a pain level of 9. Plaintiff complained of neck, arm, and back pain. Plaintiff took Tramadol. She felt she may have fibromyalgia. Plaintiff reported trying gabapentin in the past. (Tr. 1122). A September MRI was reviewed; there were no major abnormalities. (Tr. 1122). Plaintiff was to be referred to a neuro or spine surgeon. (Tr. 1123). Chest CT was normal. (Tr. 1124).

On November 3, 2016, Plaintiff was seen by Dr. Todoran of MUSC. (Tr. 1132). Plaintiff had a recent diagnosis of cervical disc disease. Subjective was radicular neck and left arm pain. Exam

was normal in all categories with no edema. (Tr. 1132). Plaintiff was stable from a cardiovascular standpoint and not experiencing symptoms of angina. (Tr. 1133).

On December 13, 2016, Plaintiff was seen by Dr. Keil. (Tr. 1245). Plaintiff reported a pain level of 8. Plaintiff reported significant, continued pain in her neck, back, and left arm that was not typically exertional. A cervical MRI showed disease may be part of the cause of this discomfort. (Tr. 1245). Palpitations reported might be isolated extra systoles and did not sound to be a tachycardia arrhythmia. (Tr. 1246). Upon exam, Plaintiff had no edema. "The left lower extremity is larger in diameter than the right.  Apparently, this was the extremity that was most significantly affected by the previous extensive DVT."  (Tr. 1246).

A December 28, 2016, Holter report showed normal rhythm throughout. Occasional PACs and rare uniform PVCs were noted. "One white QRS complex tachycardia at about 140bpm was noted, monomorphic and configuration, and likely ventricular in origin. No other cardiac arrythmias were noted." (Tr. 1242).

**2017**

On January 17, 2017, Plaintiff was seen by Dr. Keil. (Tr. 1243). An MRI showed discogenic disease, which was likely "causing the problem of back, shoulder, and chest discomfort." Plaintiff reported she went bicycling and had no particular problems with cardiac symptoms. (Tr. 1243). Upon exam, Plaintiff had no edema. Plaintiff appeared stable from a cardiovascular standpoint. (Tr. 1243). If her stress test was normal, Plaintiff would be given clearance to continue exercise on a regular basis. Plaintiff's pain issues could be addressed via physical therapy and/or orthopedic referral. (Tr. 1244).

On January 31, 2017, Plaintiff's exercise stress test was normal. (Tr. 1240-1241).

On February 14, 2017, Plaintiff was seen by Dr. Keil. (Tr. 1239). Plaintiff reported her exercise stress test was normal. Holter did show occasional ventricular ectopic beats and a single asymptomatic 70 runs of in ventricular tachycardia. Plaintiff reported significant neck and back pain, but there was no cardiac relationship. Plaintiff was referred to a spine specialist, but it was understood because of hypercoagulatbility problems that any surgery would be hazardous, but perhaps specialists could recommend some nonsurgical approaches. Upon exam, Plaintiff had persistent swelling of left lower extremity, post phlebitis syndrome. Under assessment, it is stated: "this patient remains very disabled by commendation problems. As noted, even if an orthopedist or neurosurgeon evaluates her, we could still not entertain any type of surgical intervention given this significant problem with hypercoagulability." Plaintiff took Tramadol twice daily for pain and was recommended to take Tylenol with it. "I concur with patient's hematologist that she is totally and permanently disabled." (Tr. 1239).

On February 16, 2017, Plaintiff presented to Beaufort Memorial with problems of acute cystitis, near syncope, and precordial chest pain. (Tr. 1151). Plaintiff reported feeling faint. (Tr. 1152). Exam was normal in all categories. (Tr. 1152-1153). Cardiac workup was negative. Plaintiff had a positive urine analysis and it may have been the cause of her symptoms. (Tr. 1153). "I would request primary service to work up noncardiac causes of her symptomatology." (Tr. 1170).

On March 22, 2017, Plaintiff was seen by Dr. Keil. (Tr. 1238). Plaintiff complained of upper left stomach pain. Plaintiff reported a pain level of 10. Plaintiff reported she had recently been seen in the hospital with possible vertigo related to Tramadol use and she stopped using it. Plaintiff had severe back pain radiating into her chest, ribs, and epigastric. Plaintiff was discouraged from using another person's cyclobenzaprine and hydrocodone. There was some abdominal and epigastric

14

tenderness on exam and Plaintiff's left calf was significantly larger than the right, but such was a chronic finding. "Patient continues to have what appears to be significant pain related to a spinal problem." Plaintiff's pain did not appear to be of cardiac origin. (Tr. 1238).

On April 10, 2017, Plaintiff was seen by Dr. Smith. Plaintiff reported pain was worse but medication helped some. (Tr. 1236). Plaintiff reported a pain level of 10. Plaintiff had been seen recently at the hospital for dizziness, and it was thought it could be related to the Tramadol that Plaintiff took daily for severe back pain. Plaintiff wanted a prescription for hydrocodone because she tried it and it helped a lot. A neurosurgeon would not see Plaintiff until she had MRIs. (Tr. 1236). Upon exam, Plaintiff was uncomfortable with certain movements. Assessment was very complicated medical history, chronic back pain, fibromyalgia, Factor 5 Leiden Clotting Disorder, CAD s/p stent, and CABG. (Tr. 1236-1237).

On May 10, 2017, a cervical MRI showed mild diffuse disc bulge at C5-6 with slight impingement on the anterior aspect of the cord particularly on the left. (Tr. 1149).

On May 16, 2017, Plaintiff was seen by neurosurgeon Dr. Stuart. (Tr. 1233). Plaintiff complained of pain that wraps around her shoulder and chest and radiates down her left leg and arm. (Tr. 1233). Exam was normal in all categories, except Plaintiff had mild paraspinal tenderness. Assessment was thoracic and lumbar radiculopathy. Plaintiff's symptoms were consistent with such and Medrol was prescribed. (Tr. 1233).

On June 3, 2017, Plaintiff presented to Beaufort Memorial, complaining of pain in her chest, abdomen, and throat with burning, nausea, and dizziness. (Tr. 1138). A lumbar MRI showed moderate lower lumbar facet disease with no significant compromise of the spinal canal or neural foramen. (Tr. 1136). A thoracic MRI showed mild spondylosis. (Tr. 1137). Upon exam, Plaintiff had

normal neck exam with no tenderness. Plaintiff had some epigastric tenderness. (Tr. 1140). Plaintiff had normal ECG and no abdominal obstruction. Plaintiff's symptoms improved with therapy for a GERD flare. (Tr. 1141). Impression was dehydration and GERD with esophagitis. (Tr. 1145).

On June 20, 2017, Plaintiff was seen by Dr. Keil. Plaintiff reported having been seen by the neurosurgeon twice. Findings on MRI were not profound. Surgery would not be an option due to coagulopathy. Plaintiff continued with significant pain. Plaintiff did not fill the Medrol prescription because of a prior bad experience with steroids. Dr. Stuart had told Plaintiff perhaps she had fibromyalgia and may benefit from Cymbalta or Lyrica. (Tr. 1229). Upon exam, all categories were normal with no edema. Plaintiff might not do that well on Cymbalta if fibromyalgia was "actually the problem." (Tr. 1230). Plaintiff was referred for inflammatory lab tests and a Holter monitor. (Tr. 1230).

On July 24, 2017, Plaintiff was seen by Dr. Smith. Plaintiff reported she was doing well. Plaintiff had back pain and usually just lives with it. Plaintiff had tingling down her back, ribs, and legs and sometimes her face and mouth. Increasing Klonopin helped. (Tr. 1223). "She's had a couple of visits with a neurosurgeon thru Access Health. He has addressed her head, neck, and left sided body pain. MRI's have been done and studied. Patient was told that because of her medical issues that she is not a good surgical candidate. Also nothing definitive was found in her neck to operate on." Plaintiff eagerly awaited a rheumatology referral. Plaintiff reported left-sided pain from her head down to her leg and wanted an increased dose of Klonopin, which Plaintiff reported helped with the pain. (Tr. 1223). Assessment was "her severe chronic pain seems most likely to be fibromyalgia." (Tr. 1223).

On July 26, 2017, Plaintiff presented to Beaufort Memorial with chest pain. (Tr. 1186). A

16

chest CT showed no pulmonary embolism. (Tr. 1183). Impression of exercise study was negative stress electrocardiogram for ischemia at 87% of age-predicted maximal heart rate, no significant dysrhythmias, normal blood pressure response to exercise, and above average exercise tolerance of 110% of predicted. (Tr. 1187). Plaintiff ambulated on a treadmill for eight minutes. Plaintiff's EKG showed some nonspecific ST changes. (Tr. 1188). Exam was normal with no edema. (Tr. 1188). An echocardiogram showed normal LV systolic function and no significant valvular heart disease. (Tr. 1188). Nuclear stress test showed no evidence of myocardial ischemia. (Tr. 1188-1189). EF was greater than 70%. (Tr. 1192).

On September 5, 2017, Plaintiff was seen by Dr. Keil. Plaintiff reported an emergency room visit and a negative workup. Plaintiff reported sertraline helped to some degree. Plaintiff's lab results showed it was unlikely that Plaintiff had any significant inflammatory component. Pain seemed mainly neuritic. (Tr. 1222). Upon exam, Plaintiff was tender in the left chest and left back with no edema. (Tr. 1222). Sertraline was replaced with duloxetine. Physical therapy could be considered in the future. (Tr. 1222).

On October 17, 2017, Plaintiff was seen by Dr. Keil. (Tr. 1220). Plaintiff reported Cymbalta started to help, especially with her leg and arm some. (Tr. 1220). Plaintiff reported another doctor suggested she might have fibromyalgia. "She does have rather diffuse muscle pain with negative inflammatory markers." Plaintiff felt better with Loxitane but had breakthrough pain, particularly in her left chest wall. Upon exam, "there are distinct tender spots on her back particularly in the parascapular regions in the left." Plaintiff had no edema. (Tr. 1220). Plaintiff had no benefit in the past from opiates. Duloxetine was increased. "It should be noted that some of the patient's problem may be related to sternotomy, but she does have other areas of muscular pain, including the left

17

lower extremity and low back." (Tr. 1220).

On November 23, 2017, Plaintiff presented to Beaufort Memorial. (Tr. 1174). Plaintiff was concerned she had a blood clot in her leg because of pain and swelling that started a few days prior. (Tr. 1174). Upon exam, neck, chest, respiratory, back, and cardiovascular were normal. (Tr. 1176). Extremities had tenderness to palpation and pain. (Tr. 1176). Imaging was negative for blood clot. Disposition was leg pain. (Tr. 1178).

**2018**

On January 16, 2018, Plaintiff was seen by Dr. Keil. (Tr. 1219). Plaintiff reported chest discomfort that was possibly related to median sternotomy. Plaintiff had side effects with duloxetine at a higher dose. Plaintiff gets what she calls a muscle spasm, and it responds to an increase of clonazepam. Plaintiff did get relief from many symptoms from gabapentin in the past, but it was stopped due to side effects. (Tr. 1219). EKG was within normal limits. Plaintiff had no edema upon exam. Plaintiff's chest discomfort was "probably in some way related to a chest wall neuropathic problem." (Tr. 1219). Plaintiff was advised not to use cyclobenzaprine while taking duloxetine. (Tr. 1219).

In April 2018, Plaintiff reported taking the following medications: Lovenox(blood thinner), Cymbalta(pain/depression), clonazepam (anxiety), Lipitor(high cholesterol), Aspirin(heart), and Nexium (acid reflux). (Tr. 312).

On April 25, 2018, Plaintiff was seen by Dr. Tober for leg swelling. "She has had intermittent lower extremity swelling generally well managed with graduated compression." "Swelling improves with elevation" and "lower extremity compression. Patient has not had any further DVTs or pulmonary emboli in the last 5 years." (Tr. 1292). Plaintiff reported intermittent

chest pain related to activity. Upon exam, Plaintiff ambulated normally. Plaintiff had +1 lower extremity edema and swelling. (Tr. 1293). Plan was to check IVC filter replacement and integrity. Plaintiff was to consider using Xarelto or Eliquis, but Lovenox was most tolerated by her and cost effective. There was a tilt to the filter, but it was in a good location and with integrity. (Tr. 1293).

On July 31, 2018, Plaintiff was seen by Dr. Keil. (Tr. 33). Plaintiff reported left-sided headache and intermittent left-sided chest discomfort. "The problem of fibromylagia has been benefitted by using Cymbalta and clonazepam." Under subjective, "we await disability determination. She had her hearing at about 3 months ago and expects to find the results within the next several days. Hopefully, she will be able to obtain disability, which will avail her to work comprehensive medical care." (Tr. 33)(any errors in original). Objective exam was normal with no edema. Plaintiff appeared stable for the most part and had no recent cardiovascular symptoms. "She does obviously continue to have significant pain in the past has been related to what was felt to be fibromyalgia." (Tr. 33).

On October 2, 2018, Plaintiff was seen by Dr. Keil for followup on fibromylagia. (Tr. 11). Plaintiff complained of back, trunk, and leg pain and that medications were not working. (Tr. 11). Duloxetine was making her drowsy and not helping significantly with her atypical chest pain. Plaintiff used naproxen and Flexeril. Gabapentin made her drowsy in the past. There were chronic exam findings of left leg larger than right and appeared to be thrombosed vein in left calf that was nontender. (Tr. 11). Plaintiff was doing about the same. "She still does have issues with pain, related to what has been felt to be fibromyalgia." Gabapentin was started. Pain was not related to the statin. (Tr. 11).

C.    **The Administrative Proceedings**

19

1.    **The Administrative Hearing**

    a.    **Plaintiff's Testimony**

On May 1, 2018, Plaintiff appeared at a hearing before ALJ Peggy McFadden-Elmore. Plaintiff was represented by an attorney. (Tr. 35). Thomas Neil was present as a vocational expert.

Plaintiff testified she had not been on any medication for migraines. (Tr. 39). Plaintiff drives three times a week. (Tr. 42). PRW was discussed. (Tr. 42-43). Plaintiff testified she had fatigue as a side effect from medications. (Tr. 44). If Plaintiff does one chore, she is down for the rest of the day and must get in the recliner and put her feet up or lay down. (Tr. 44-45). Plaintiff is in severe pain in her back down her left leg. (Tr. 45). "I have fibromylagia real bad." "It hits my pressure point," and also neuropathy pain from being cut where pain is in her chest, shoulder, back, neck, and left side of her head and then down into her left leg. (Tr. 45). Plaintiff wakes up with a pain level of 3-4, but by the end of day is an 8. (Tr. 45). Plaintiff usually cannot wear a bra because of pain. (Tr. 46). Plaintiff can walk 30 minutes, and then her left leg from her knee to her ankle swells. (Tr. 46). Plaintiff can stand thirty minutes. Plaintiff can sit with her legs hanging for 30-45 minutes. (Tr. 46). Plaintiff gets headaches once or twice a week on the left side. (Tr. 47). Plaintiff testified she had factor five and a clotting disorder; it was under control before her surgery. (Tr. 47). Plaintiff reported she did not have a day without swelling, especially if she is on her feet or sits too long or does not have her legs elevated. (Tr. 48). Swelling started three weeks after her heart surgery. (Tr. 48). The ALJ questioned Plaintiff about a 2018 note from Dr. Tolver that swelling was well managed generally with gradual compression and that Plaintiff had not had a DVT in the last five years. Plaintiff testified that was not correct because she had clots in her left leg at Beaufort Memorial hospital. (Tr. 48). Plaintiff's attorney stated the records in February 2015 were of a clot because she

20

could not afford the medication Lovenox at that time. (Tr. 49). In November 2017, Plaintiff thought she had a clot, but she did not. (Tr. 49). Plaintiff stated there were other times she was unable to get treatment or medications because of financial limitations. (Tr. 50). Plaintiff testified she went to the hospital a lot of times with chest and back pain, and there was no answer for what was causing it. (Tr. 50). Doctors think it is neuropathy pain. Volunteers is the only place Plaintiff can afford to go to and they do not have a specialist. (Tr. 50). Plaintiff was recommended to see a neurologist. (Tr. 50). Plaintiff has used gabapentin and Cymbalta. (Tr. 50). She cannot take some medications because they affect her psychologically. (Tr. 51). Plaintiff had not been able to see the neurologist yet because of money. Plaintiff spends 7-8 hours a day down more than up. (Tr. 51). Plaintiff can do chores but is down after that. (Tr. 51-52).

        **b.    Vocational Evidence**

The VE classified Plaintiff's past work. (Tr. 53). The VE opined that past work of deliverer and secretary was available for an individual of Plaintiff's age, education, and prior work experience limited to light, never climb ladders/ropes/scaffolds, occasionally climb ramps/stairs, occasionally crawl, frequently balance/stoop/kneel/crouch, and avoid concentrated exposure to workplace hazards. (Tr. 53). Past work of secretary was available for an individual limited to sedentary, never climb ladders/ropes/scaffolds, occasionally climb ramps/stairs, frequently balance, occasionally stoop/kneel/crouch/crawl, and avoid concentrated exposure to workplace hazards. (Tr. 54). If the individual needed unscheduled breaks of unpredictable duration due to pain, no work was available. (Tr. 54). If absent one day a week, no work would be available. (Tr. 55).

        **2.    The ALJ's Decision**

In the decision of September 6, 2018, the ALJ made the following findings of fact and

conclusions of law (Tr. 15-24):

1.   The claimant meets the insured status requirements of the Social Security Act
     through December 31, 2018.

2.   The claimant has not engaged in substantial gainful activity since September
     30, 2015, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et
     seq.*).

3.   The claimant has the following severe impairments: coronary artery disease
     status post CABG, degenerative disc disease, chronic venous insufficiency,
     a history of deep vein thrombosis, fibromyalgia, and atypical chest pain (20
     CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments
     that meets or medically equals the severity of one of the listed impairments
     in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
     404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has
     the residual functional capacity to perform light work as defined in 20 CFR
     404.1567(b) and 416.967(b) with some non-exertional limitations. The
     claimant is capable of lifting and/or carrying 20 pounds occasionally and 10
     pounds frequently. She is capable of standing and/or walking at least 6 hours
     in an 8-hour workday and sitting about 6 hours in an 8- hour workday. She
     can never climb ladders, ropes and scaffolds; frequently balance, stoop, kneel
     and crouch, and occasionally climb ramps and stairs, and crawl. She must
     avoid concentrated exposure to workplace hazards.

6.   The claimant is capable of performing past relevant work as a delivery person
     and secretary. This work does not require the performance of work-related
     activities precluded by the claimant's residual functional capacity (20 CFR
     404.1565 and 416.965).

7.   The claimant has not been under a disability, as defined in the Social Security
     Act, from September 30, 2015, through the date of this decision (20 CFR
     404.1520(f) and 416.920(f)).

## II. DISCUSSION

Plaintiff argues the ALJ erred in the evaluation of opinions. Plaintiff argues the ALJ failed to properly conduct the subjective symptom evaluation. Plaintiff argues the ALJ failed to properly assess the RFC. Plaintiff argues the DLI is incorrect. Defendant argues the ALJ supported her findings with substantial evidence and no harmful error is alleged as to the DLI issue.

A.     LEGAL FRAMEWORK

1.     The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.  42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims).  An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5)

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do.  The Agency considers the Listed impairments, found at

23

whether the impairment prevents him from doing SGA.  *See* 20 C.F.R. § 404.1520.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982).  The claimant bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments

---

20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii).  To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**B.      ANALYSIS**

**DLI**

Plaintiff argues the DLI is incorrect. Defendant argues the ALJ supported her findings with substantial evidence and no harmful error is alleged as to the DLI issue.  The ALJ found a DLI of December 31, 2018. Important here, the ALJ's decision was issued September 6, 2018.  The ALJ considered the entire relevant period and there were no records not discussed because of any harmless error in the DLI finding. Even if Plaintiff is correct that the DLI should have been June 20, 2019, any error was harmless because it did not change the outcome of this case. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994).

**Opinions**

Plaintiff argues the ALJ erred in the evaluation of opinions, particularly Dr. Etheridge, Dr. Keil, and state agency consultants.

The Social Security Administration's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c).  Generally, more weight is given to the opinions of examining physicians than nonexamining physicians.  More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment.  *See*  20 C.F.R. § 404.1527(c). The medical opinion of a treating physician is entitled to controlling weight, i.e., it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  *See* 20 C.F.R. § 404.1527(c)(2), SSR 96-2p, and *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be

26

accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585,590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178 (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

State agency medical consultants "are highly qualified ...who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled." 20 C.F.R. § 404.1527(e).

In determining what weight to give the opinions of medical sources, the ALJ applies the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. *See* SSR 96-2p; *Hines v. Barnhart*, 453 Fd 559,563 (4th Cir. 2006).

Dr. Etheridge

In February 2016, Dr. Etheridge opined that Plaintiff had good ability to complete complex tasks, had good attention/concentration, and had worried/anxious mood/affect. Medication helped Plaintiff's depression/anxiety; psychiatric care had not been recommended. (Tr. 935). The ALJ found:

As for the opinion evidence pursuant to 20 CFR 404.1527 and 416.927, I have

considered the medical opinions, which are statements from acceptable medical sources which reflect judgments about the nature and severity of the impairments and resulting limitations, of the claimant's treating physicians, evaluating physicians, and the state agency medical consultants. I give great weight to the assessment of Dr. Tricia Etheridge from February 2016 regarding the claimant's mental limitations as her assessment is supported by the treatment notes and objective evidence of record (Exhibit 8F).

(Tr. 23). As summarized above, treatment notes and objective evidence of record are as the ALJ stated supportive of Dr. Etheridge's opinion and an appropriate factor to consider under the regulations. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (generally the more consistent an opinion is with the record as a whole, the more weight will be given to it).Substantial evidence supports the ALJ giving great weight to Dr. Etheridge's opinion.

State Agency Consultants

The ALJ found:

Regarding the medical opinions of the DDS medical consultants, I accord them significant weight as their opinions are generally consistent with the other evidence of record. Although these physicians were non-examining, their opinions do deserve great weight as they are supported by the evidence of record, including the claimant's treatment history, findings upon examination, and the claimant's activities of daily living as described throughout this decision.

(Tr. 23). Plaintiff's sole argument is that the opinions were two years prior to the decision date and earlier than the opinions of Dr. Keil and Dr. Etheridge. Substantial evidence supports the ALJ's decision to give significant weight to the DDS medical consultants. State agency non-examining opinions "can constitute substantial evidence in support of an ALJ's decision over the opinion of an examining physician so long as the opinions from the non-examining physicians are consistent with the record as a whole." *Roberson v. Colvin*, No. CV 0:15-3486-TMC-PJG, 2016 WL 11200696, at *7 (D.S.C. Sept. 6, 2016), *report and recommendation adopted sub nom.*, 2017 WL 473922 (D.S.C.

Feb. 6, 2017 (*citing Smith v. Schweiker*, 795 F.2d 343, 345-46 (4th Cir. 1986); *Stanley v. Barnhart*, 116 Fed. Appx. 427, 429 (4th Cir. 2004) (disagreeing with the argument that the ALJ improperly gave more weight to residual functional capacity assessments of non-examining state agency physicians over those of examining physicians and finding that the ALJ properly considered evidence provided by those physicians in context of other medical and vocational evidence) & *citing* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified ... [and] are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider [their] findings and opinions as opinion evidence")).  There is always time lapse between state agency review and ALJ review and the regulations impose no particular limit on how much time may pass between an opinion and the ALJ's decision; different opinions later in time than state agency opinions do not mean such should be accorded great weight. *Id.* Moreover, the record is clear that the ALJ considered evidence dated after the consultant's findings. The ALJ further limited Plaintiff beyond the state agency physicians' limitations with the additional limitation of avoiding concentrated exposure to workplace hazards. (Tr. 20).

Dr. Keil

Plaintiff argues the ALJ failed to weigh Dr. Keil's opinions. Defendant argues the ALJ was not required to evaluate Dr. Keil's 2017 and 2018 statements as opinions because they were not opinions as defined in the regulations.  Dr. Keil stated in February 2017 that Plaintiff "remains very disabled by commendation problems" and stated his agreement "with patient's hematologist that she is totally and permanently disabled." (Tr. 1239). On July 31, 2018, Dr. Keil stated in the subjective part of the notes: "Hopefully she will be able to obtain disability which will avail her to work

comprehensive medical care" (Tr. 33). The ALJ did discuss Dr. Keil's treatment notes, citing Exhibit 19F that contained the disability statement. (Tr. 21-23). Even assuming error in the failure to weigh Dr. Keil's statements, such was harmless error. Dr. Keil's statements were on an issue reserved to the Commissioner and not entitled to any special significance. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (explaining that the issue of whether a claimant is disabled or unable to work is reserved to the Commissioner, and opinions by medical sources on that point are not entitled to special significance); *Plowden v. Colvin*, No. 1:12-CV-2588-DCN, 2014 WL 37217, at *16 (D.S.C. Jan. 6, 2014)("Opinions that a claimant is disabled or unable to work are reserved to the Commissioner and are not considered medical opinions."); *see Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir.1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").

Conclusion

It cannot be said here that the ALJ has not given good reason for the weight afforded to these particular opinions. *See* 20 CFR § 404.1527(d). The ALJ's decision to give such opinions such weights was based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). The ALJ complied with SSR 96-2p(rescinded for applications after March 27, 2017)[3] in making clear to a subsequent reviewer the weight given and the reasons for that weight. Given the deferential standard of review, the court cannot say that the ALJ here did not provide citation to substantial evidence to support his findings on these opinions. After a review of the ALJ's decision as discussed above and

---

[3] The changes to the former 20 C.F.R. § 404.1527, which SSR 96-2p provided guidance on, are not effective to applications prior to March 27, 2017.

a review of the records relied on by the ALJ, the ALJ properly gave reasons for the weight given to these opinions.   The ALJ's findings are supported by substantial evidence and she conducted a proper analysis in accordance with the applicable law, regulations, and policies.

**Subjective Symptom Evaluation**

Plaintiff argues the ALJ failed to properly conduct the subjective symptom evaluation. Defendant argues the ALJ provided supported reasons for finding Plaintiff's allegations were not consistent with the record.

SSR 16-3p is applicable to cases decided after its effective date, such as this case. *See Morton v. Berryhill*, No. 8:16-cv-0232-MBS, 2017 WL 1044847, *3 (D.S.C. Mar. 20, 2017).   Although SSR16-3p eliminates usage of the term "credibility" because the regulations do not use the term, the assessment and evaluation of Plaintiff's symptoms requires usage of most of the same factors considered under SSR96-7p.

Under *Craig v. Chater*, 76 F.3d 585, 591-96 (4th Cir. 1996), subjective complaints are evaluated in two steps.   First, there must be documentation by objective medical evidence of the presence of an underlying impairment that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged.   Not until such underlying impairment is deemed established does the fact-finder proceed to the second step: consideration of the entire record, including objective and subjective evidence, to evaluate the intensity and persistence of symptoms to determine how symptoms limit capacity for work.   *See also* 20 C.F.R. § 404.1529; SSR16-3p, *4.

The ALJ may choose to reject a claimant's testimony regarding his condition, but the ALJ must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence.   *Hatcher v. Sec'y, Dep't of Health & Human Servs*., 898 F.2d 21, 23 (4th Cir.

1989) (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984)). A claimant's allegations "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers[.]" *Craig*, 76 F.3d at 595. The ALJ considers the evidence in the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's decision. *See id.*; *see* SSR 16-3p, at *4.

A claimant's statements about intensity, persistence, and limiting effects of symptoms, which are inconsistent with the objective medical evidence and other evidence, are less likely to reduce his capacity to perform work related activities. SSR 16-3p, at *7; 20 C.F.R. § 404.1529(c). An individual's symptoms are evaluated based on consideration of objective medical evidence, an individual's statements directly to the Administration, or to medical sources or other sources, and the following factors:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, at *7; 20 C.F.R. § 404.1529(c). The ALJ at step three is to "consider the individual's symptoms when determining his or her residual functional capacity and the extent to which the individual's impairment-related symptoms are consistent with the evidence in the record." SSR

16-3p, at *11.

Plaintiff specifically argues that the ALJ summarily dismissed Plaintiff's coronary artery disease by stating there was no indication Plaintiff required repeated hospitalizations for these conditions. Plaintiff argues the ALJ erred in his discussion of chronic venous insufficiency, history of deep vein thrombosis, and long term diagnosis of Factor 5 Leiden. Plaintiff argues the ALJ's statement regarding treatment for allegations of disabling pain was not supported by the record. Plaintiff argues the ALJ cherry picked the record regarding treatment for FM.

The ALJ considered Plaintiff's testimony:

At the hearing, the claimant testified that she had stents implanted in July 2015 and then required coronary bypass surgery in October 2015. She lives with her parents. She writes with her right hand, but does everything else with her left hand. She drives about 3 times a week. She has fatigue, but is not sure if it is caused by her medications. If she tries to mop or vacuum, she has severe pain and has to spend the rest of the day in bed or in the recliner. Her back pain radiates into her leg. Her mother does the cooking. She has pain from fibromyalgia and neuropathy in her chest, neck, back, and left leg. She cannot lift more than 10 pounds. She can walk and stand each for 20-30 minutes before her leg swells. She can sit for 30-45 minutes at a time. She has headaches 1-2 times a week. She has had blood clots in her leg which were not helped by compression hose. There was another time last year she was thought to have a blood clot, but a scan was negative. There have been other times that she was unable to afford treatment. She receives medical care from Volunteers in Medicine. They want her to see a neurologist to get her pain under control, but she cannot afford it. She elevates her legs in the recliner 7-8 hours of the day.

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because they are not completely supported by the objective evidence of record.

33

(Tr. 22). The ALJ then reviewed evidence concerning Plaintiff's coronary artery disease. (Tr. 21). The ALJ noted surgery in October 2015 that was successful in relieving symptoms. (Tr. 21). December 2015 notes assessing Plaintiff as stable from a cardiovascular standpoint were considered, and again in April 2016, November 2016, and January 2017. (Tr. 21). The ALJ considered hospital emergency room cardiac workups that were negative/normal in February 2017 and July 2017, and a January 2018 note that Plaintiff's chest discomfort was likely neuropathic. (Tr. 21).

The ALJ turned to discuss the evidence regarding chronic venous insufficiency and history of deep vein thrombosis with Plaintiff's treatment with a hematologist. (Tr. 21-22). May 2016 imaging showed a chronic clot and the specialist's recommendation was more vigilance with compression. November 2017 imaging was negative for DVT. February 2018 notes stated Plaintiff had not had any further DVT or pulmonary emboli in five years. (Tr. 22).

Further, the ALJ discussed evidence concerning Plaintiff's allegations of FM, noting there was no evidence of Plaintiff meeting the required trigger point number criteria and Plaintiff did not fill a prescription because of a prior bad experience. (Tr. 22). The ALJ noted the record was unclear if Plaintiff had followed through with a rheumatology referral. (Tr. 22).

Generally, the ALJ noted: "there is no indication that claimant required repeated emergency treatment or inpatient hospitalization for these conditions." (Tr. 22). In making this statement, viewing the ALJ opinion as a whole, the ALJ did review hospital records, which included admissions for further testing given Plaintiff's complex history, but ultimately resulted the majority of the time in normal results, imaging, tests, and exams. (Tr. 21-23).

As to pain allegations, the ALJ noted: "In spite of her allegations of disabling pain, the claimant has not sought additional treatment for pain including physical therapy, biofeedback,

34

surgery, chronic narcotics, steroid injections, or treatment from a pain clinic. Overall, this course of treatment is inconsistent with a level of severity that would preclude the claimant from sustaining any work activity." (Tr. 22). The ALJ previously noted July 2017 notes that Plaintiff was not taking Hydrocodone but would take Naproxyn or a muscle relaxer occasionally for back pain, citing Exhibit 19F. (Tr. 22). The ALJ noted a normal physical exam in August 2016 when Plaintiff sought care for neck and back pain and the same for March 2017. The ALJ noted a June 2017 exam of 5/5 strength, intact sensation, and mild paraspinal tenderness, citing Exhibit 19F. (Tr. 22-23). The ALJ reviewed MRIs.

The ALJ concluded:

> In sum, the claimant's severe impairments include coronary artery disease, degenerative disc disease, chronic venous insufficiency, a history of deep vein thrombosis, fibromyalgia, and atypical chest pain. I do not find the claimant's subjective complaints of a limited ability to sit, stand walk, lift, carry and use her right upper extremity, or a need to elevate her legs and lie down throughout the day to be consistent with the objective evidence. However, I have given the claimant the benefit of the doubt in limiting the amount she can sit, stand, walk, lift, carry, climb, balance, stoop, kneel, crouch, crawl, and be exposed to hazards. However, I cannot find the claimant's allegations that she is incapable of all work activity to be consistent with the evidence.

(Tr. 23).

The standard of review here is not whether conflicting evidence might have resulted in a contrary decision, but it is whether substantial evidence supports the ALJ's decision. Even with some evidence that Plaintiff was prescribed Tramadol and not a good surgical candidate due to hypercoagulability with no specific surgery recommended, the ALJ provided more than a mere scintilla of record support for findings that Plaintiff's allegations of disabling symptoms were not consistent with the record. The ALJ sufficiently explained how Plaintiff's subjective allegations of

the severity of impairments were not entirely consistent with the evidence. Based on the evidence before the ALJ, the ALJ conducted a proper evaluation of subjective symptoms and cited substantial evidence to support the finding that there are no medical findings of such severity that suggest that the claimant is completely incapable of all work activity.

**RFC**

Plaintiff argues the ALJ failed to properly assess the RFC.

An adjudicator is solely responsible for assessing a claimant's RFC. 20 C.F.R. § 416.946(c). In making that assessment, he must consider the functional limitations resulting from the claimant's medically determinable impairments. Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2. This ruling provides that: "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8, *7. "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* Additionally, " 'a necessary predicate to engaging in a substantial evidence review is a record of the basis for the ALJ's ruling,' including 'a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.' " *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (*quoting Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)). The ALJ considers the evidence in the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's decision. *See Craig*, 76 F.3d at 595.

When a claimant has more than one impairment, the Commissioner "must consider the combined effect of a claimant's impairments and not fragmentize them." *Walker v. Bowen*, 889 F.2d

36

47, 50 (4th Cir. 1989). (citations omitted).  The ALJ is required to "adequately explain his or her evaluation of the combined effects of the impairments."  *Id.*  This court must uphold the Commissioner's decision as long as it is supported by substantial evidence.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Regulations require that an ALJ "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe," in determining the claimant's RFC.  20 C.F.R. § 416.945(e); *see also* SSR 96–8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' ").

As discussed above under the subjective symptom evaluation, the ALJ thoroughly discussed the record in the RFC narrative.  (Tr. 21-23).  The ALJ reviewed contemporaneous treatment notes that did not reveal "the type of significant clinical and laboratory abnormalities one would expect if the claimant were disabled." (Tr. 22).  Later, the ALJ concluded that further limitations in sitting, standing, walking, lifting, carrying, and using right upper extremity, or elevating legs or lying down were not consistent with the objective evidence, but provided Plaintiff with some benefit of doubt in limiting some exertional and postural activities. (Tr. 23).  The ALJ discussed Plaintiff's impairments in the RFC narrative and provided sufficient explanation for the limitations in the RFC finding. Accordingly, the ALJ's discussion and analysis, as a whole, is sufficient to demonstrate that she considered the Plaintiff's impairments in combination and is sufficient for the court to properly review the ALJ's conclusion on this issue. *See Thornsberry v. Astrue*, 2010 WL 146483, *5 (D.S.C. Jan. 12, 2010) and *Brown v. Astrue*, 2012 WL 3716792, *6 (D.S.C. Aug. 28, 2012).

## III.  CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the

Commissioner were based on substantial evidence. *Richardson*, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock*, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). As previously discussed, despite the Plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, and pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is AFFIRMED.

s/ Thomas E. Rogers, III

October 22, 2020                    Thomas E. Rogers, III
Florence, South Carolina           United States Magistrate Judge